*In re* V.H. *et al.*, Minors (V.H. *et al.*, Minors, Petitioners-Appellees, v. Gary T. Morgan, Guardianship Adm'r of the Department of Children and Family Services, *et al.*, Respondents-Appellants).

First District (6th Division)  No. 1—89—3167

Opinion filed April 20, 1990.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Robert G. Toews, Assistant Attorney General, of Chicago, of counsel), for appellants.

Patrick T. Murphy, Public Guardian, of Chicago (Lee Ann Lowder, Assistant Public Guardian, of counsel), for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

The minor petitioners, Veronica H., Krystina S., Dale Y., Ronald A., David B. and Rickey L., are wards of the State of Illinois. They sought a preliminary injunction when respondents Gary T. Morgan, Guardianship Administrator of the Illinois Department of Children and Family Services (DCFS), and Ina Denton, Deputy Director of DCFS, decided to remove the minors from a residential treatment facility in Arkansas and return them to Chicago. Following a full hearing in which expert witnesses and the minors testified, the parties entered into an agreed order under which the minors would remain in Arkansas pending an independent assessment to determine the children's best interests. The trial court also issued a preliminary mandatory injunction ordering respondents to arrange for payment to the facility while the children remain in Arkansas.

Respondents filed an interlocutory appeal from that preliminary injunction, and we stayed the trial court's order pending this appeal. On appeal, respondents contend that the court order is void because it violates sovereign immunity and that the court abused its discretion in granting the injunction because it intruded into the authority reserved for DCFS as to which placement services are fit and proper for the children.

In July 1987, DCFS entered into a contract with Lord's Ranch, a residential program in Warm Springs, Arkansas, to care for DCFS wards. DCFS then began placing the six petitioners at the Lord's Ranch (the Ranch).

Petitioners are adjudicated delinquent, dependent, neglected or abused minors who were made wards of the court, and Morgan was appointed their guardian. Extensive testimony and records revealed that the children, aged 12 to 19, all have serious emotional and behavioral problems. They have all been in multiple placements in DCFS custody and have been rejected by five or more residential facilities in Illinois. For example, David failed in 11 placements and was rejected by 15 agencies. Rickey failed in 8 placements, and Dale in 14 placements. Two of the children were sent to the Ranch directly from the Department of Corrections. They have all posed a danger to others, and several have been hospitalized for emotional problems. They have been involved in battery, arson, sexual assaults on other children, burglaries, drugs, alcohol, criminal damage to property, and shoplifting.

The record also establishes that the children have made signifi-

cant progress at the Ranch. The children testified that they believed they were doing well in this placement and wanted to remain there.

In January 1988, DCFS and the Ranch entered into a corrective action plan in order to bring the Ranch into compliance with certain DCFS regulations. DCFS decided to remove petitioners from the Ranch because DCFS was not planning to renew the contract, which expired September 1, 1988. DCFS thereafter renewed its contract for placement services with the Ranch several times. Later in 1988, an audit revealed a $108,957 overpayment by DCFS to the Ranch. The Ranch began repaying the amount to DCFS. As of September 1, 1989, $64,145 was still outstanding.

On February 15, 1989, DCFS entered into an agreed order to "maintain [the] minors in placement at the Ranch through June 30, 1989 or until further order of this court."

In June 1989, DCFS informed the Ranch that the contract would not be renewed and that alternative placements for the children would be found. The final contract between the Ranch and DCFS extended from July 1, 1989, until September 30, 1989. The contract provides:

> "The Department shall not be liable for payment for service provided after the Contract termination date or after the last child is removed from the provider's care, whichever is later."

On July 12, 1989, DCFS entered into an agreed order to submit a report of the guardian by September 4, about the future plans for placement of the children, and to maintain the children in placement at the Ranch, as provided in the agreed order dated February 15, 1989, until further order of the court. On September 14, 1989, counsel for petitioners filed a motion for a preliminary injunction, naming Morgan in his capacity as guardian.

On September 18, 1989, Morgan moved to dismiss the motion for preliminary injunction, contending the court had no jurisdiction to grant the relief and maintaining that Morgan had no authority to supply funding for placement following the September 30 expiration of the contract.

On September 21, 1989, petitioners sought leave to file an amended motion for preliminary injunction, adding Denton as a respondent and asking that DCFS conduct psychological evaluations of petitioners, allow petitioners to remain at the Ranch, and pay for that placement through the appeal process. On September 25, the court granted leave to file the amended petition.

Eight days of hearings were held between September 25 and October 4, 1989. Dr. Allen Ravitz, a psychiatrist, testified that DCFS'

plan to return the children to Chicago was an unreasonable and unnecessary intrusion on their physical and emotional well-being, which would put the children at risk of harm to themselves and to others. Denise Kane, a social worker, testified that the plan to return the children to Chicago was a substantial departure from accepted professional standards and practices, which demonstrated that those responsible for devising the plan had failed to use professional judgment. The experts' opinions were offered without contradiction.

On October 4, 1989, counsel for respondents stated to the court:

> "[B]eing two weeks from the time that we started this entire matter and now knowing many more matters then we knew at the beginning, it has become clear to me and my co-counsels, and to others in the department, that the plan to return the petitioners to Chicago and to work with the agency called Kaleidoscope is really an unworkable plan. It is clear to me that the petitioners are not interested in later returning to Chicago and working with that agency. Without their cooperation, the plan is pretty much down the drain."

Counsel added that DCFS would like time to meet with the children and make an assessment, and that "the Lord's Ranch can bill us for the costs that are going to be incurred, that of course being another major problem. There is now no contract; and I think if we can get this opportunity [for a continuance], we might be able to straighten this matter out, once and for all."

The court granted a continuance to enable the parties to confer and try to decide on a plan they could agree upon regarding an assessment of the children. Respondents' counsel, however, stated that the Ranch would not be paid during that time. "I indicated they could bill us, they could send us a bill. *** There is sixty thousand dollars that they owe us, that can be set off against, but without a contract, I don't—there is no way under the State budget and appropriations *** that they can get paid, [but] we can set off against the sixty thousand. This is why I am asking for a short period of time." She informed the court: "I don't believe [the children] are going to be thrown off [the Ranch]. I believe what the Ranch will try to do is try to settle with us on that sixty thousand. When that problem arises, we will address it."

On October 17, 1989, the parties appeared before the court and reported the result of their negotiations. DCFS had reconsidered the plan to bring the children to Chicago and agreed to let them remain at the Ranch until assessments were completed. Respondents' counsel also stated that what DCFS had "offered to do is take the old rate from the old contract, break it down into actual costs and to pay the

Lord's Ranch per that rate-setting system." The court then permitted the parties to complete the hearing.

Denton testified that she withdrew the plan to return the children to Chicago because the plan "would most probably not *** meet their needs." What she was "willing to do is to contract with an agency in Arkansas to do those assessments so that we have a clear understanding of the needs of the youngsters so that appropriate plans would be developed for them."

The juvenile court entered an order prohibiting respondents from removing the children from the Ranch until assessments are completed, service plans made, and objections heard and resolved. The court ordered the parties to submit proposed findings of fact and conclusions of law.

On November 3, 1989, the court denied respondents' motion to dismiss the preliminary injunction and respondents' request for a stay of the preliminary injunction order. The court also adopted petitioners' proposed findings of fact, conclusions of law and their proposed order. The order stated:

> "A. By agreement of the parties, Gary T. Morgan and Ina Denton are hereby enjoined from removing the children from placement at the Lord's Ranch until further order of Court, so that the parties may obtain [*sic*] pending an independent assessment of the children by Northwestern University, University of Chicago or Loyola University.
>
> B. Gary T. Morgan and Ina Denton are hereby ordered to make arrangements to pay the Lord's Ranch for placement of the children at the per diem rate which was in effect on September 30, 1989, pending this independent assessment, and until further order of Court."

On November 16, 1989, petitioners filed a petition for rule to show cause against respondents for failing to make arrangements to pay the Ranch for the children's case, in violation of the earlier court order. Respondents have filed this interlocutory appeal.

Respondents first contend that the juvenile court's preliminary injunction violates sovereign immunity specifically because it requires respondents to enter into a contract and to make payments out of State funds.

In determining whether a suit brought against the State is barred by sovereign immunity, the focus is not on the identification of the formal parties, but rather on the issues involved and the relief sought. (*City of Springfield v. Allphin* (1980), 82 Ill. 2d 571, 413 N.E.2d 394; *Board of Trustees v. Illinois Community College Board*

(1978), 63 Ill. App. 3d 969, 380 N.E.2d 988.) A suit against State officials which seeks to compel them to perform their duty is not held to be a suit against the State, and the payment of State funds may be compelled. *Board of Trustees v. Illinois Community College Board*, 63 Ill. App. 3d 969, 380 N.E.2d 988.

Respondents themselves define the issues here. They ask whether they can be told "which placement services are fit and proper to serve DCFS wards," when in fact they have agreed to that continued placement, and told "to supply funding for the continued stay of the minors" in the agreed upon residence.

■ The legislature has imposed upon DCFS the duty to provide social services to certain children and to provide rehabilitative and residential services for them. (Ill. Rev. Stat. 1987, ch. 23, par. 5001 *et seq.*) The Constitution recognizes a protectible liberty interest which requires DCFS to provide minimally adequate care and treatment of children in its custody. *Youngberg v. Romeo* (1982), 457 U.S. 307, 319, 73 L. Ed. 2d 28, 39, 102 S. Ct. 2452, 2459-60; *B.H. v. Johnson* (N.D. Ill. 1989), 715 F. Supp. 1387.

■ We hold that the trial court has enjoined respondents from taking actions in excess of their delegated authority and in violation of petitioners' protectible liberty interests, and that such a ruling does not contravene the immunity prohibition. See *Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 370 N.E.2d 223, citing *County of Cook v. Ogilvie* (1972), 50 Ill. 2d 379, 383, 280 N.E.2d 224; *Owens v. Green* (1948), 400 Ill. 380, 408-09, 81 N.E.2d 149; *People ex rel. Freeman v. Department of Public Welfare* (1938), 368 Ill. 505, 506-07, 14 N.E.2d 642; see also *Aurora National Bank v. Simpson* (1983), 118 Ill. App. 3d 392, 454 N.E.2d 1132.

The fact that an expenditure of State funds is required does not alter this finding. (See, *e.g., Bio-Medical Laboratories, Inc. v. Trainor*, 168 Ill. 2d 540, 370 N.E.2d 223; *People ex rel. Hilger v. Myers* (1969), 114 Ill. App. 2d 478, 252 N.E.2d 924.) This is especially true where respondents have agreed to the placement and have admitted before this court that DCFS will "ultimately" be responsible for making such payments.

■ Respondents also argue that even if the juvenile court had jurisdiction to enter an injunction, respondents have no authority to perform on behalf of DCFS "absent the approval or acquiescence of the DCFS director." This contention is not persuasive, since it was respondents, purportedly with the authority of DCFS, who agreed to the continued placement of the children in Arkansas pending an independent assessment of their needs. Moreover, Denton testified that

what she was "willing to do is to contract with an agency in Arkansas to do those assessments so that we have a clear understanding of the needs of the youngsters so that appropriate plans would be developed for them." In addition, Jack Targonski, administrator of contracts and grants for DCFS, testified that he prepared a contract with the Ranch "at the direction of the Director of Cook County Operations." That director is Denton.

In addition, the final contract between DCFS and the Ranch provides:

> "The Department shall not be liable for payment for service provided after the Contract termination date or after the last child is removed from the provider's care, whichever is later."

Obviously, the last child has not been removed from the provider's care.

■ Respondents next contend that the juvenile court abused its discretion in granting the injunction because it intruded into the authority reserved for DCFS' judgment as to "which placement services are fit and proper to serve DCFS wards." This argument contradicts respondents' agreement to continue the placement of the children at the Ranch. It is also contrary to what respondents have stated at oral argument, that the only issue before this court concerned the immediate payment of funds to the Ranch, and did not concern DCFS' admitted judgment that it was "fit and proper" to permit the children to remain at the Ranch.

Respondents also contend that injunctive relief should not be granted against public officials unless such acts are either outside their authority or unlawful.

■ These children have a constitutional right to minimally adequate care. (*Youngberg v. Romeo* (1982), 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452.) They have a right not to be subjected to multiple placements which may cause them emotional harm. (*K.H. v. Morgan* (N.D. Ill. Sept. 6, 1989), No. 87 C 9833, slip op. at 19.) Respondents admitted before the juvenile court that the placement plans it had devised for the children were inadequate. Two experts testified that the placement plans to return the children to Chicago were an unreasonable and unnecessary intrusion on their physical and emotional well-being, that the move would place the children at risk to themselves and others, and that the plan was a substantial departure from accepted professional standards and practices. The trial court correctly concluded that the decision to remove the children from placement at the Ranch "was arbitrary and capricious, and constituted an abuse of discretion." We agree with its conclusion that, based upon the uncontra-

dicted expert testimony, the "decision to move the children, where they have been placed for more than two years and have made significant progress, violated the children's constitutional rights."

Respondents point to DCFS' "tremendous struggles dealing with the Lord's Ranch," and its "stormy" relationship with the Ranch, including the $60,000 still due from the Agency. Again, in view of the fact that respondents have agreed to petitioners' continued placement at the Ranch, and repeatedly insist that DCFS can "work out" its financial problems with the Ranch, we see little relevance to this argument. See *Bio-Medical Laboratories, Inc. v. Trainor*, 68 Ill. 2d 540, 370 N.E.2d 223 (notwithstanding fact that Department of Public Aid made $321,291 in overpayments to Bio-Medical, court upholds order restraining director of Department from suspending corporation's right to participate in medical assistance program).

■ Respondents belatedly argue that injunctive relief is improper because no threat of irreparable harm has been shown. A preliminary injunction will be granted if irreparable harm would result if the injunction is not forthcoming. (*Lindsey v. Board of Education* (1984), 127 Ill. App. 3d 413, 468 N.E.2d 1019.) Respondents maintain that, because they agreed to leave the children at the Ranch, the children's best interests were being protected and no irreparable harm could occur. The argument unpersuasively assumes that the Ranch, a private agency, will keep the children indefinitely, with no payment, despite the fact that it apparently cost the Ranch approximately $30,000 per month to care for the children. It has already absorbed these costs for nearly six months.

Nor are we persuaded by respondents' argument that the financial matters will be settled in a separate action which DCFS has filed against the Ranch. That suit does not address the costs incurred beginning October 1, 1989, and continuing to accrue until the last child leaves the Ranch. Moreover, six months have passed, and thus, we do not accept respondent's urging that DCFS will "ultimately" reimburse the Ranch for these costs.

We conclude that the obvious dilemma which DCFS forces upon the Ranch, to support these children for free until such time as DCFS decides differently, can only result in irreparable harm to DCFS' own wards. They will be forced to return to Chicago, where DCFS has no placement plans, or return to the streets. Either alternative would appear to be disastrous.

Respondents rely on *Dixon Association for Retarded Citizens v. Thompson* (1982), 91 Ill. 2d 518, 440 N.E.2d 117, for the proposition that the trial court should not interfere in matters reserved to agency

discretion, such as deciding which placement services are fit and proper to serve DCFS wards. In *Dixon*, however, the agency had developed an extensive relocation plan for retarded persons under its care. The court concluded that there was no indication of a "precipitous, unplanned closing and transfer of the residents," and instead "the evidence indicates that there was detailed, considered planning for the closing of this facility and that there was a sincere attempt to develop a program for relocating the residents in a manner that would accommodate the residents' individuals needs." (*Dixon Association for Retarded Citizens v. Thompson*, 91 Ill. 2d at 534, 440 N.E.2d at 125, citing *Youngberg v. Romeo* (1982), 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452.) In contrast, the present case does not reveal any plan at all.

For the foregoing reasons, the injunction order entered by the circuit court of Cook County is affirmed.

Judgment affirmed.

LaPORTA, P.J., and EGAN, J., concur.